UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Elias Dakwar, MD, | : |
| | : |
| Plaintiff , | : Civil Action  No. 1:26-cv-4471 |
| | : |
| v. | : **COMPLAINT AND JURY** |
| | : **DEMAND** |
| Columbia University in the City of New | : |
| York, the Trustees of Columbia University in | : |
| the City of New York, New York State | : |
| Institute for Psychiatry, and the Research | : |
| Foundation For Mental Hygiene, Inc. | : |
| | : |
| Defendants. | : |
| | : |

Plaintiff, Elias Dakwar, MD ("Professor Dakwar" or "Plaintiff")  by and through his attorneys, brings this VERIFIED COMPLAINT against DEFENDANTS: Columbia University in the City of New York ("Columbia" or "Columbia University" or "Defendant"); the Trustees of Columbia University ("the Trustees"), the New York State Psychiatric Institute ("NYSPI" or "NYS") and the Research Foundation for Mental Hygiene, Inc. ("RFMH") (collectively "Defendants"); and alleges as follows:

## PRELIMINARY STATEMENT

1. This is an action by a distinguished Professor and researcher whose career has been severely impacted by and through the heinous conduct of Columbia University, which failed to abide by its own policies, and by federal and state law. Instead of investigating Professor Dakwar's complaint of discrimination and disparate treatment, Columbia repeatedly ignored his complaints, delayed providing him responses, and subjected him to further discriminatory treatment. Even after reporting discriminatory treatment, drawing attention to a racist book promotion on a Columbia recommended readings list, and

speaking to multiple figures of authority, Professor Dakwar was treated in clear violation of his rights; in fact, Columbia University took no action against his concerns except for one: terminating Professor Dakwar.

2. Professor Dakwar was terminated in the Fall of 2024 after the Defendants presented him with a list of fabricated and false reports of his conduct as a researcher. The purported justifications for terminating Professor Dakwar were demonstrably pretextual. They were also not supported by his direct supervisors. Nor is Professor Dakwar the sole victim of Columbia University's racist and discriminatory disregard for students, faculty, and staff of Palestinian descent. Columbia University's actions here—terminating Professor Dakwar for having complained about discriminatory treatment and remarks—not only shows malice but also deliberate indifference to the well-being of its employees.

**PARTIES**

3. Plaintiff PROFESSOR ELIAS DAKWAR, MD is an individual over the age of 18 and is a resident of New York.

4. Defendant COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK is a large private research and educational university with a campus in upper Manhattan where the action alleged in this complaint occurred.

5. Defendant TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK is the legal name of Columbia University in the City of New York, a private education institution with a campus in upper Manhattan where the actions alleged in this complaint took place.

6. Defendant NEW YORK STATE PSYCHIATRIC INSTITUTE, located at the Columbia University Irving Medical Center, is a research-based hospital located in New York, New York where the action alleged in this complaint occurred.

7. Defendant RESEARCH FOUNDATION FOR MENTAL HYGIENE, INC. located at 150 Broadway, Suite 301 Menands, New York, is a non-profit organization based in New York.

## JURISDICTION AND VENUE

8. This Court has original jurisdiction under 28 U.S.C. §1331, because federal questions are presented, and it has supplemental jurisdiction over the State law claims under 28 U.S.C. § 1367(a).

9. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts and omissions giving rise to the claims occurred in this District.

10. Plaintiff received Right to Sue Letters from the EEOC, issued on February 27, 2026.

## STATEMENT OF FACTS

11. Professor Dakwar was an Associate Professor of Psychiatry at Columbia University and a practicing psychiatrist, working primarily with people suffering from addiction.

12. Professor Dakwar attended Creighton Medical School, completed his residency at the University of Chicago, and completed his fellowship at Columbia University.

13. He trained as a fellow in the Division of Substance Use between 2008 and 2011 at the New York State Psychiatric Institute ("NYSPI"), a facility for psychiatric training, research and patient care affiliated with Columbia University Medical Center. Upon completion of his

fellowship, he was promoted to a tenure-track Assistant Professor position, and to a tenured Associate Professor position several years later.

14. Since 2011, Professor Dakwar has been conducting independent research with National Institutes of Health ("NIH") funded grants through RFMH based at NYSPI.

15. Professor Dakwar is a Palestinian-Israeli-American, and was the only Associate Professor of Clinical Psychiatry, Research Psychiatrist, and independently funded researcher of Palestinian descent in his department at the NYSPI ("the Department").

16. Since 2012, Professor Dakwar began experiencing hostility at Columbia University and the NYS, including derogatory comments and discriminatory attitudes toward Palestinians.

17. Professor Dakwar's interactions throughout the department have been colored by hateful and discriminatory remarks, thereby creating a hostile workplace.

18. Throughout the Department, Professor Dakwar has heard several colleagues express remarks such as "they use human shields" or "they want to kill all Jews" or "they only want war" in reference to Palestinians.

19. Professor Dakwar has always remained cordial and friendly regardless of the discriminatory remarks and the hostile work environment.

20. Within a week of the Hamas attack on October 7, 2023, Professor Dakwar conferred with Division Chief Frances Levin, MD ("Dr. Levin") during a video call, inquiring about how she was faring, expressing his own concerns about the region being overwhelmed in war, and articulating his own views on the importance of restraint. Professor Dakwar also expressed his concern about his family within Israel, and a few hostages with whom he had a connection. Dr. Levin, who had outwardly expressed support for and identification

with Israel in the past and who knew Professor Dakwar's background, concealed her identification with Israel and ambiguated Professor Dakwar's identity as neither Arab nor Palestinian. In light of the more explicit discrimination Professor Dakwar experienced over the ensuing year, with his termination occurring approximately one year later, this dissimulation is noteworthy.

21. Over the ensuing year, the Defendants maintained a hostile attitude and environment towards Palestinians. Professor Dakwar's research and well-being suffered, and his reputation was tarnished, under the force of racist tropes generally attached to Palestinians—e.g., that they are dishonest, manipulative, and hostile—that became explicitly directed at him. These racist biases were also given blatant institutional legitimacy by being promoted in a departmental email. When Professor Dakwar attempted to call attention and meaningfully address these biases, he experienced retaliation.

## A. The Internal Review Board, Advarra, and Audit of Professor Dakwar's Research Project #7543

22. In June 2023, all human research at NYSPI was suspended after a preliminary investigation as a result of a participant suicide in a NIH-funded clinical trial 2 years prior unrelated to Professor Dakwar's research. This investigation found structural and systemic deficiencies, primarily related to the Institutional Review Board ("IRB") and its oversight mechanisms and biases. A third-party outside audit was performed by Advarra. As part of this Department-wide audit, Professor Dakwar had several studies that were audited. Three of these studies were large NIH-funded trials that were in their final phases. The auditing capacity of Advarra and the IRB were independent of one another.

23. The auditing process for the Advarra investigators involved a four part process: 1) provide an oral overview to auditors to reduce bias and ensure best practices, 2) provide participant records selected by Advarra for review in order to determine whether a study has been compliant, 3) address any issues that emerge from the audit with the NYSPI IRB, and formulate a corrective action plan ("CAPA"), and 4) once this plan is approved it is submitted to the Advarra IRB ("A-IRB"). The auditing and IRB capacities of the Advarra are independent of one another and work separately.

24. Professor Dakwar's research projects, specifically #7461, #7543, and #7889 were audited in the fall/winter of late 2023 and early 2024. These were each large multi-million dollar trials funded by NIH.

25. In March of 2024, Project #7461 received a greenlight letter to submit the protocol to A-IRB with an approved CAPA.

26. In July of 2024, Project #7889 received an approved CAPA; however, it never received a greenlight letter.

27. Project #7543 met with greater difficulties. The audit had gone well, without the auditors flagging anything as problematic, but correspondence with the IRB about a prospective question suggested by the auditors regarding future reporting led to the determinations of "serious and continuing non-compliance" and "unexpected problems" on May 14, 2024.

28. During a video call that occurred shortly after the determination was issued, the IRB misrepresented Professor Dakwar in various ways: that he had not answered questions (he was dishonest), prolonged the correspondence (he was manipulative and negligent), and been otherwise incommunicative (he was hostile). This led them to "base [their] determination on the little information [they] had." The communication record, however,

indicated timely and swift correspondence, with each question answered fully and appropriately.

29. During the call, Professor Dakwar was asked to provide, in writing, further information about the points under consideration.

30. The representatives of the IRB with whom Professor Dakwar spoke - Stephanie Collins-Reed and Diana Martinez - were long-time colleagues of Professor Dakwar. They had all worked in the same Division, and were competing for grants from the same funding bodies. In light of Advarra's finding that a major systemic issue was that the IRB exhibited biases, it was highly problematic that 1) the existing IRB was still allowed to make such consequential decisions such as who was or was not in severe compliance, and 2) the decision was made and represented by colleagues of Professor Dakwar, who may be contending with their own biases and personal perspectives.

31. Professor Dakwar raised this systemic issue with Vice Chair of Research Dr. Roberto Lewis. He also called attention to what he experienced as disparate and discriminatory treatment, and to suggest that the report of severe and continuing non-compliance be withheld until it can be evaluated more objectively.  Dr. Lewis dismissed Professor Dakwar's concerns as merely his own personal viewpoints.

32. On or around May 17th, Professor Dakwar provided further information to address the IRB's concerns as requested.

33. Professor Dakwar was informed in a casual conversation with Frances Levin, MD that the determination was not based on the "specific case" but rather on a "general impression."

34. The term "general impression" was used without any objective criteria or documentation, making it impossible for Professor Dakwar to respond meaningfully or defend himself.

35. Dr. Levin informed Professor Dakwar that the "non-compliance" and "general impression" included certain behaviors such as tardiness with turning in timesheets, none of which were relevant to human subjects' protections.

36. Professor Dakwar was initially told that there was no way to challenge the determination. After reaching out to Dr. Levin for guidance, she stated "off the record" on May 30th, 2024 that it was possible to appeal, and another faculty member had effectively appealed. Professor Dakwar asked why other faculty had been offered the opportunity to challenge the determination, and he was not. This went ignored until Professor Dakwar was told a week later by Dr. Levin and Dr. Foltin (another senior member of the Division) that a "new" mechanism had been created to appeal the determination.

37. A NIH Project Officer ("PO") had reached out to Professor Dakwar after he received the determination of non-compliance and requested that Professor Dakwar submit a corrective action plan. Professor Dakwar responded by stating that he was appealing the determination, provided a summary of what had occurred, and informed the PO that the corrective action plan would not be formulated until his concerns regarding the determination were addressed.

38. Professor Dakwar received a note the following day from NYSPI administration admonishing him for disclosing this information to the Project Officer, even though Professor Dakwar along with all other faculty had been informed that he could respond to Project Officers if a Project Officer reached out to him.

39. On the June 31st, 2024 deadline, an application for continued funding for project #7543 was not submitted to the NIH by NYSPI.

40. On or around July 2nd, 2024 an appeal of the determination was submitted to the IRB in line with the mechanism proposed a week prior.

41. Professor Dakwar was scheduled for a meeting to discuss these matters on July 10, 2024. During this meeting, he was told not to speak with POs, even if they reached out to him, unless he ran his communication by an administrator first. This reflected a clear example of disparate treatment predicated on an impression that Professor Dakwar was unruly and needed his problematic communications with others to be managed by his superiors. This was the first time in his 16 years at Columbia that Professor Dakwar was chastised in this way.

42. On or around July 15th, 2024 the IRB reviewed Dakwar's appeal and overturned its determination of unexpected problems but upheld the determination of non-compliance without any further information. Multiple requests were made to the IRB and HRPP to understand the continued determination of non-compliance, especially in the absence of any problems, and what specifically needed correction, without a response.

43. Subsequent incident reports were submitted by the HRPP/IRB to NIDA pertaining to project #7543. All reports contained false information and did not address any particulars of Professor Dakwar's alleged "non-compliance."

44. The IRB Chair accepted the CAPA that was submitted with revisions on September 9, 2024 regarding the "protocol violations", but the HRPP never signed the actual CAPA for the findings from the whole audit and returned it to Plaintiff.

45. Despite Professor Dakwar's efforts in complying with all requests to remedy any compliance issues, he and his research team were not able to apply for continued grant funding and continue their work. Correspondence with the IRB was also marked with increasing hostility.

46. Professor Dakwar also learned that NYSPI was given a mandate to "fire people" and, in order for the Institute to save itself, it needed to "root out bad apples."

**B. NYSPI Refuses to Submit an Application for Continued Funding for Project #7889**

47. In order to continue his research on project #7889 at NYSPI, Professor Dakwar required a No Cost Extension ("NCE") from the National Institute on Alcohol Abuse and Alcoholism ("NIAAA").

48. On or around August 26, 2024, Professor Dakwar was informed by the signing official, Janelle Dierkens ("Dierkens"), that the extension request would be submitted by "the end of the month, if not a little after."

49. On September 11, 2024 Professor Dakwar received a notification from the NIAAA that a grant extension application for funding was closed.

50.  Professor Dakwar wrote Dierkens along with Drs. Gordon and Lewis regarding the application for extension, in which Dierkens then explained there were grave concerns about the research under his leadership and that they would not apply for an NCE.

51. This determination was rooted in the Department's clear discriminatory attitude towards Professor Dakwar. The audit for his research and the corrective action plan had been approved, and the study itself proceeded without any problems. NYSPI had no basis in refusing to submit a NCE on behalf of Professor Dakwar.

C. **Columbia's Refusal to Retract and Correct Language Regarding a Racist Anti-Palestinian Book Promoted by Columbia University**

52. On July 11, 2024, a summer reading list from the Department of Psychiatry included the promotion of a discredited anti-Palestinian book.

53. A senior member of the faculty recommended *From Time Immemorial*, by Joan Peters. The Department included it on an institutional summer list that was disseminated through email and available by a link on the Department website. This book, published in the early 1980s, is widely discredited as a racist hoax; it depicts Palestinians as a fabricated ethnicity pretending to be indigenous to the region while working to displace Jews prior to the founding of Israel.

54. In his recommendation, the senior faculty member stated "Given the reinvention of a false history around the conflict in the Middle East, this writer went there to demonstrate how one side had displaced another from their home. The facts indicated the opposite of what she hypothesized." He casually describes Palestinian history as a "false reinvention", propagating with institutional backing the racist smears of Palestinians as a dishonest, manipulative, and hostile group that had, additionally, perpetrated ethnic cleansing.

55. The book alleges to have evidence that historic Palestine was indeed "a land without a people for a people without a land" and further suggests that it was not Zionist but Arab immigration that displaced the indigenous people, which in Peters' account was primarily Jewish. It also perpetuates a longstanding racist myth that there was no Palestinian suffering and displacement at the founding of Israel.

56. Professor Dakwar immediately expressed his concern to the Department, stating his concerns about the racism at the institutional level that allowed for such a book to be

formally recommended, as well as the faculty member's racist language in recommending the book.

57. The link to the reading list was disabled in the website. No retraction of the book from the list occurred, the email was not corrected, and the issue was not communicated to anyone within the Department.

58. Merely removing the link to the list without addressing the concerns would not and did not contribute to remedying the hostile attitude Columbia expressed towards Palestinians with the reading list.

59. On August 14th, 2024 Professor Dakwar had a meeting with Dr. Veenstra-VanderWeele, the acting chair, to discuss these matters. He dismissed Professor Dakwar's concerns about the book recommendation and falsification of history as "a personal opinion," and as "dramatic" and "self-serving." He explicitly stated no retraction would be made.

60. On September 4th, 2024 Professor Dakwar met with the DEI specialist at NYSPI, Lindsey Hennawi, LCSW ("Hennawi") to discuss having her serve as a signatory on a letter conveying his concerns to the President of Columbia and CUIMC. In discussing the promotion of the book and his conversation with Dr. Veenstra-VanderWeele, Professor Dakwar was told by Hennawi that she had serious concerns about racism. Hennawi filed a complaint for racism pertaining to Professor Dakwar's conversation with Dr. Veenstra-VanderWeele.

61. On September 6th, 2024 Professor Dakwar sent a letter to Dr. Katrina Armstrong, President of Columbia and CUIMC, signed by multiple faculty members asking for the book recommendation to be explicitly retracted, and for the historical record to be reaffirmed.

62. After several weeks, the CUIMC task force determined no action would be taken. It was also wrongly stated in the letter that the book recommendation had been withdrawn.

63. On December 4, 2024,  a determination was made that the complaint sent by Hennawi to the Anti-Discrimination Investigations Division of NYS was not pursued because it had already been "administratively handled." This email was sent more than 30 days after Professor Dakwar was wrongfully terminated.

### D. **Professor Dakwar's Unlawful Termination**

64. On October 23, 2024, Professor Dakwar attended a meeting where he was presented with probationary reports and informed of his termination. This was the first time he had ever been presented with probationary reports, which he was told during the meeting were standard practice for the first several years of a permanent state-line tenure (which Professor Dakwar was granted several years prior when he was promoted to Associate Professor). Importantly, the probationary reports only began to be collected, to his knowledge, after October 7, 2023.

65. In the first probationary report presented to him, dated July to December 2023, signed by Dr. Frances Levin, Professor Dakwar was deemed to have satisfactory performance.

66. In the January to June 2024 probationary report, also signed by Dr. Frances Levin, Professor Dakwar was said to have submitted an NCE without abiding by the proper procedure. This was an inaccurate and false representation.  Though the report was marked as "satisfactory," Dakwar was asked to sign the report even though his supervisor was not present.

67. In the July to December 2024 probationary report, Professor Dakwar was marked unsatisfactory on every measure. The report included multiple falsehoods,

decontextualized statements, and mischaracterizations. The report was written in early October of 2024, only halfway through the reporting period. This report was also not signed by Professor Dakwar's supervisor, Dr. Frances Levin, but by Dr. Roberto Lewis.

68. Professor Dakwar's termination was predicated on these falsities described within the report.

69. Many of the criticisms within the report pre-dated the reporting period, dating back in some cases several years. Specific falsities included in the probationary report include three studies that had been stopped due to non-compliance; participants being enrolled without meeting criteria; a protocol violation being found in the audit that led to the charge of non-compliance; and the CAPA from prior trials not being followed, such as meetings occurring without a senior faculty member. All of these statements are false and misrepresent the actual facts in an effort to paint Professor Dakwar in an extremely negative light.

70. Frances Levin, MD told Dr. Kate O'Malley, a coordinator in the Dakwar lab, that she had refused to sign the document, and did not agree with the termination. She also stated that she had communicated to NYSPI and Columbia leadership that there were more accurate, more favorable, and more truthful characterizations for the points alleged in the final probationary report. Dr. Levin's concerns, however, were superseded by the effort to portray Professor Dakwar in a hostile light, and to not allow for further investigation, due process, or correction.

71. Dierkens informed Professor Dakwar that the RFMH would follow NYS in the termination of his employment. Two weeks later, Professor Dakwar's faculty appointment at Columbia was also terminated.

72. The chair of the Department, Dr. Josh Gordon, allegedly communicated a few pertinent facts about Professor Dakwar's termination and scientific standing. He represented Professor Dakwar as a brilliant, reputable scientist based on what he had heard from colleagues including Frances Levin (contrary to the misrepresentations above), and that the reason for termination was that he was "not a good fit" with the Department. He also indicated explicitly that Professor Dakwar's calling attention to anti-Palestinian bias "did not help" - and that the decision to terminate was not Dr. Gordon's, despite his being chair at the time, but that it had been made "prior to his involvement."

73.  It is evident that Professor Dakwar was being targeted for his Palestinian background and because he challenged Columbia's anti-Palestinian conduct.

E.  **Continued Misrepresentations by Columbia against Professor Dakwar and Interference**

74. Professor Dakwar was misrepresented as the only investigator in non-compliance with clinicaltrials.gov. He was, and is still, misrepresented as being negligent with the status of his clinical trials on the website.

75. Despite being asked by NYSPI to designate the trials as suspended on the site, NYSPI claims Professor Dakwar had not changed their status. Professor Dakwar was never asked to change the status of the trials within the multiple correspondences that had occurred between the NYSPI administrator and his team.

76. The issue could have been addressed by giving another faculty or team member the role of clinicaltrials.gov maintenance over Professor Dakwar's trials, and having this person attend to all relevant matters on the site. But this was not done due to "concerns about any penalties being accorded to this person instead of to [Professor Dakwar]", effectively

putting the clinicaltrials.gov on hold, which further exacerbated the issue and further tarnished Professor Dakwar's reputation.

77.  The falsehoods provided pretextually at Professor Dakwar's termination pertain to trial management and coordination. The coordinators for Professor Dakwar's trials, Dr. Kate O'Malley and Brandi Wagner, were involved in all aspects of trial coordination and management. It is recognized that while a Principal Investigator is ultimately responsible for these trials, the study coordinators play a crucial role in coordination, book-keeping, data management, and administrative matters. Both Dr. O'Malley and Ms. Wagner were kept on as study administrators after Professor Dakwar's termination, and assigned different supervisors.  Dr. O'Malley was told by departmental leadership on multiple occasions that she was highly esteemed and that "the problem was [Professor Dakwar] not [her]." This served to 1) further tarnish Professor Dakwar's reputation,  and at the same time 2) reveal the pretextual nature of the charges against him, with the coordinating team extolled - even though they had served as long-time administrators responsible for managing a lab later designated to be in severe non-compliance and associated with grave concerns.

## CLAIMS FOR RELIEF
### Count I - Employment Discrimination in Violation of Title VII, 42 U.S.C. § 2000e-2
### (against all defendants)

78. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 77 as if fully set forth herein.

79. Plaintiff is a member of a protected class based on his national origin.

80. As a Palestinian-Israeli-American, Plaintiff is of Palestinian descent, which is a protected characteristic under applicable anti-discrimination laws.

81. Plaintiff was qualified for his position as a professor and researcher at Columbia University and subsequently the NYSPI and through the RFMH.

82. Professor Dakwar held his position at Columbia University and conducted research, demonstrating his qualifications for the role.

83. Plaintiff was terminated from his position at Columbia University, NYSPI, and RFMH.

84. The adverse action occurred under circumstances giving rise to an inference of discrimination.

85. Professor Dakwar experienced hostility and discriminatory treatment including derogatory comments related to his Palestinian origin. The inclusion of a discredited anti-Palestinian book in a summer reading list and the dismissal of his concerns about racism further support an inference of discrimination.

86. Defendants subjected Professor Dakwar to discriminatory treatment which resulted in a hostile work environment and in Professor Dakwar being treated differently than his peers and counterparts with respect to the terms, conditions, and privileges of his employment. He received disparate treatment with respect to the Defendant's false and baseless conclusions pertaining to the IRB review and Advarra review findings; termination from Columbia for false and baseless reasons, and humiliation of Professor Dakwar by classifying him as a "non-compliant" in correspondence with outside regulatory bodies. Said conduct made it extremely difficult for Professor Dakwar to conduct his job and research and constituted a material adverse employment action.

87. Columbia University and New York State was on notice that Professor Dakwar was in a hostile work environment, with a DEI specialist having alleged racist treatment after

Professor Dakwar had reported the derogatory remarks made to him by leadership. Nevertheless, Columbia and New York State took no action to protect Professor Dakwar.

88. In discriminating against Professor Dakwar on the basis of his national origin and race as alleged herein, Defendants acted in a willful, negligent and reckless manner, and exhibited a conscious disregard of and deliberate indifference to violations of Professor's rights under the anti-discrimination laws of Title VII and other statutes.

89. Defendant's discriminatory actions have caused and will continue to cause Professor Dakwar to suffer irreparable and significant damage to his personal and professional reputation, his well-being, and the severe humiliation that accompanies it, as well as substantial present and future financial loss of earning, compensation, and employment benefits.

**Count II – Retaliation in violation of NYSHRL § 296(7) and NYCHRL § 8-107**
**(against all defendants)**

90. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 89 as if fully set forth herein.

91. Plaintiff belongs to a protected group.

92. Professor Dakwar is of Palestinian descent, which is a protected characteristic under applicable anti-discrimination laws.

93. Based upon the aforementioned facts, Professor Dakwar has a reasonable belief that Defendants, by and through their employees, agents or representatives, engaged in unlawful conduct under the NYSHRL.

94. Since 2012, Professor Dakwar experienced hostility at Columbia University, including derogatory comments and discriminatory attitudes toward Palestinians.

95. The harassment was based on a protected characteristic.

96. The hostility and discriminatory attitudes were directed at Professor Dakwar due to his Palestinian origin.

97. The harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment.

98. The harassment occurred over a prolonged period, from 2012 until Professor Dakwar's termination in October 2024. Specific incidents include the inclusion of an anti-Palestinian book in a summer reading list and the dismissal of Professor Dakwar's concerns about racism as "dramatic" and "self-serving." Further incidents include disparate treatment in audits, reviews and reports as described above.

99. Professor Dakwar's research trial reviews were unfairly conducted and based on falsehoods designed to ultimately terminate him.

100. Professor Dakwar's good faith complaints to Columbia of the discriminatory and racist treatment that he was enduring constituted protected activities under the NYSHRL and the NYCHRL.

101. Columbia University, as the employer, failed to take reasonable steps to prevent or address the hostile work environment experienced by Professor Dakwar.

102. Instead, Defendants chose to terminate Professor Dakwar.

103. Professor Dakwar was fired because he did not merely report the unlawful conduct on his own behalf, but also because he requested direct action from the Defendants after they released a recommended reading list with a blatantly false and racist book.

104.    At the minimum, Professor Dakwar's complaints and actions were motivating factors for the disparate treatment he received in the review process of his projects and trials, and ultimately his own termination.

105.    In retaliating against Professor Dakwar's conduct, Defendants acted in a willful and/or negligent manner, disregarding Professor Dakwar's rights under the anti-retaliation provisions of the NYSHRL and NYCHRL.

106.    Defendants' retaliation has caused and will continue to cause Professor Dakwar to suffer irreparable and significant damage to his personal and professional reputation, and severe and last humiliation that accompanies it, as well as substantial financial loss.

### Count III - Retaliation in Violation of Title VII, 42 U.S.C. § 2000e-3(a)
### (against all defendants)

107.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 106 as if fully set forth herein.

108.    Plaintiff engaged in protected activity.

109.    Professor Dakwar raised concerns about racism and discrimination, including objecting to the promotion of an anti-Palestinian book in an institutional summer reading list.

110.    The employer was aware of the protected activity.

111.    Professor Dakwar expressed his concerns to Dr. Veenstra-VanderWeele, and a good faith complaint about racism was filed by Diversity Specialist Lindsey Hennawi on September 4, 2024, all of which constitute protected activities under Title VII.

112.    Professor Dakwar's grant extension application for project #7889 was unjustly not submitted on September 11, 2024, and he was terminated from his position on October 23, 2024.

113.    There was a causal connection between the protected activity and his termination. Defendants' firing of Professor Dakwar because of his complaint was a violation of Title VII.

114.    In retaliating against Professor Dakwar for having reported discriminatory conduct, Defendants acted in a willful disregard for Professor Dakwar's rights under the anti-retaliation provisions of Title VII and other statutes.

115.    Defendants' retaliation has caused and will continue to cause Professor Dakwar to suffer irreparable harm and significant damage to his personal and professional reputation, and the severe and lasting humiliation and anguish that accompanies it, as well as substantial financial loss.

### Count IV – Breach of Contract
### (against all Defendants)

116.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 115 as if fully set forth herein.

117.    Plaintiff and Defendants entered into a valid and enforceable employment contract under which Plaintiff was employed by the Defendants.

118.    Defendants breached their employment agreement with Professor Dakwar by wrongfully terminating him as a form of retaliation, and on the basis of his identity as a Palestinian.

119.  Plaintiff fully performed his obligations pursuant to the employment agreement.

120.  In October of 2024, Professor Dakwar was terminated from his position at Columbia University and NYSPI. Defendants failed to follow procedural safeguards and due process protections under University policies.

121. Defendants' termination of Professor Dakwar was not justified by any conduct constituting cause, nor did Defendants provide Professor Dakwar with meaningful notice or an opportunity to be heard.

122. Professor Dakwar's termination appears to be in violation of anti-discrimination laws, as it occurred in the context of ongoing discriminatory treatment based on his Palestinian origin and in apparent retaliation for his complaints about discrimination.

123. As a direct and proximate result of Defendants' breach, Plaintiff has suffered and continues to suffer damages, including loss of salary and benefits, damage to professional reputation, and emotional distress.

124. Professor Dakwar has no adequate remedy at law and seeks full compensatory damages and any further relief the Court deems just and proper.

### Count V – Defamation
### (against all Defendants)

125. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 124 as if fully set forth herein.

126. Professor Dakwar was employed as a professor at Columbia University.

127. On October 23, 2024, Professor Dakwar was informed of his termination from Columbia University.

128. Upon information and belief, in connection with Professor Dakwar's termination and thereafter, Columbia University, through its agents, employees or representatives made false and defamatory statements concerning Professor Dakwar, including but not limited to statements that Professor Dakwar had engaged in misconduct, violated university policies, or was otherwise unfit to continue in his position.

129. These statements were published orally and/or in writing to third parties, including but not limited to other faculty members, university staff, and others outside of Plaintiff's immediate academic department.

130. Professor Dakwar was misrepresented as the only investigator in non-compliance with clinicaltrials.gov. He was, and is still, misrepresented as being negligent with respect to the status of his clinical trials on clinicaltrials.gov.

131. Columbia's false statements directly impacted Professor Dakwar's appearance of competence, integrity, and character.

132. As a direct and proximate cause of Columbia defamatory statements, Plaintiff has suffered and continues to suffer substantial harm, including damage to his reputation, emotional distress, loss of income, diminished future employment prospects, interruption of longstanding research, and other economic damages.

133. Columbia University's actions were willful, wanton, malicious and there entitles Professor Dakwar to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A.      Compensatory damages against all defendants for lost wages and benefits in an amount to be proven at trial;

B.      Punitive damages against all defendants pursuant to in an amount to be determined at trial;

C.      Reasonable attorney's fees and costs;

D.      Injunctive relief enjoining Defendants from engaging in further defamatory or retaliatory practices;

E.    Pre-judgment and post-judgment interest as allowed by law;

F.    Such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

May 28, 2026

**THE LAW OFFICE OF JOHN F. OLSEN, LLC**

By: _John Olsen_

John F. Olsen
Attorneys for Plaintiff

105 Grove Street, Suite 6
Montclair, New Jersey 07042
t. (973) 932-0474
jolsen@jfolsenlaw.com

**DUNBAR LAW PC**
Ronald W. Dunbar, Jr. (pro hac to be filed)
Jaffar Shiek (pro hac to be filed)
One Boston Place, Suite 2600
Boston, MA 02108
dunbar@dunbarlawpc.com
617-244-3550